1
2
3
4
5
6
7

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
John J. Nelson, (SBN 317598)
jjn@classactionlaw.com
501 West Broadway Suite 1260
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

Attorneys for Plaintiffs
and the Putative Classes

8

## UNITED STATES DISTRICT COURT

9

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| TINA FENG, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>v.<br><br>TOYOTA MOTOR NORTH AMERICA, INC., a California corporation; TOYOTA MOTOR SALES, USA, INC., a California corporation; and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., a Kentucky corporation,<br><br>           Defendants. | Case No:  '20 CV0534 CAB BLM<br><br>**CLASS ACTION COMPLAINT FOR:**<br>**1.      VIOLATION OF CAL. CIV. CODE §§ 1750,** *et seq.***;**<br>**2.      VIOLATION OF CAL. CIV. CODE § 1790,** *et seq.***.;**<br>**3.      VIOLATION OF CAL. BUS. & PROF. CODE §§ 17500,** *et seq.***;**<br>**4.      VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200,** *et seq;*<br>**5.      NEGLIGENCE; AND**<br>**6.      VIOLATION OF MAGNUSON-MOSS WARRANTY ACT 25 U.S.C. §§ 2301,** *et seq.*<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT

Plaintiff Tina Feng ("Plaintiff") brings this class action on behalf of herself and all others similarly situated against defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, USA, Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively "Toyota" or "Defendants"). Based on personal knowledge as to matters relating to herself and her own actions, and on information and belief based on the investigation of counsel, including counsel's review of consumer complaints available on the database of the National Highway Transportation Safety Administration ("NHTSA") and other publicly available information, as to all other matters, Plaintiff alleges as follows:

## I.     INTRODUCTION

On January 13, 2020, Toyota submitted a safety recall report (the "Recall Report") to NHTSA voluntarily recalling nearly 700,000 Toyota and Lexus vehicles[1] manufactured between August 1, 2018 through January 31, 2019 with defective low-pressure Denso fuel pumps (the "Recall"). In the Recall Report, Toyota identified a dangerous defect in the low-pressure fuel pump which can fail and cause the Recalled Vehicles to unexpectedly stall and cause the engine to shut down:

> These fuel pumps contain an impeller that could deform due to excessive fu absorption…[i]f impeller deformation occurs, the impeller may interfere with the fuel pump body, and this could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall...

("Fuel Pump Defect"). Approximately 695,541 Recalled Vehicles are covered by the Recall, but the same dangerous condition is present in all 2018-2019 Toyota

---

[1] 2018-2019 Toyota 4Runner, 2019 Toyota Avalon, 2018-2019. 2018-2019 Toyota Camry, 2019 Toyota Corolla, 2018-2019 Toyota Highlander, 2018-2019 Toyota Land Cruiser, 2018-2019 Toyota Sequoia, 2018-2019, Toyota Sienna, 2018-2019 Toyota Tacoma, 2018-2019 Toyota Tundra, 2019 Lexus ES, 2018-2019 Lexus GS, 2018-2019 Lexus GX, 2018-2019 Lexus IS, 2018-2019 Lexus LC, 2018-2019 Lexus LS, 2018-2019 Lexus LX, 2019 Lexus NX, 2018-2019 Lexus RC, 2018-2019 Lexus RX ("Recalled Vehicles").

CLASS ACTION COMPLAINT

manufactured vehicles equipped with low-pressure fuel pumps with part number prefix 23220- or 23221- ("Class Vehicles") that gave rise to the Recall.

1. Toyota concluded that the Fuel Pump Defect in Class Vehicles presents an immediate risk of physical injury when used in their intended manner and for their ordinary purpose.

2. Toyota has long known of the Fuel Pump Defect in the Class Vehicles, despite marketing Class Vehicles as safe and dependable. Toyota admitted in the Defect Information Report accompanying the Recall Report that it received thousands of warranty requests related to the Fuel Pump Defect in Class Vehicles.

3. The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, bodily injury, or even death. A vehicle that stalls or suffers engine shutdown is at heightened risk for collision. A vehicle that stalls or suffers engine shutdown causes drivers to react to remove themselves from danger, typically by exiting the road. Drivers stranded on the side of the road experience a heightened risk of danger, whether it is from other vehicles or weather elements.

4. Fuel pump failure can prevent the driver from accelerating at the necessary and anticipated pace. Diminished acceleration ability creates unexpected hazards, startling drivers of the Class Vehicles and other drivers in their proximity. Finally, once a Class Vehicle fuel pump fails, the vehicle becomes totally inoperable and will not start.

5. While Toyota knew about the Fuel Pump Defect and the associated dangers, Toyota manufactured, marketed, sold, leased, and warranted Class Vehicles, and, in its quest for corporate profits, did not disclose to the unsuspecting public that Class Vehicles were inherently defective, dangerous and create a grave risk for bodily harm or death. As proof of its knowledge, Toyota identified in its Defect Information Report "66 Toyota Field Technical Reports and 2,571 warranty claims" associated with the Fuel Pump Defect. Toyota did not disclose, and to this day has not fully disclosed,

what it knew about the Fuel Pump Defect to prospective purchasers and lessees, and existing owners.

6.    To date, Toyota has not identified a remedy for the Fuel Pump Defect, stating only that "[t]he final corrective repair action is still under study." Thus, whether there will be a corrective repair, if so, when, and whether it will fix the problem are all unknown. Moreover, owners and lessees of the Class Vehicles are unknowingly driving on roads and highways in potentially ticking time bombs while Toyota knowingly exposes its customers, from whom it made at least $20 million from the sale of just the Recalled Vehicles, to the risk of grave physical harm and even death.

7.    Moreover, with or without a viable remedy for the Fuel Pump Defect, the Recall has decreased the intrinsic and resale value of the Class Vehicles. Plaintiff and other Class members have been damaged as a result.

8.    Further, those customers who have received a recall notice, and who brought their cars to the dealership, were provided loaner vehicles of lesser quality than those that they leased or bought. Despite being provided loaner vehicles of lesser quality, the consumers affected by the recall must still make their full lease payments, or have paid the full purchase price but are deprived of the benefit of the bargain they struck when leasing or purchasing the Class Vehicles.

9.    Throughout the relevant period, Toyota's marketing of the Class Vehicles was and is replete with assurances about their safety and dependability. A vehicle that can suddenly stall and lose power during normal operating conditions is inherently unsafe and renders Toyota's marketing of the Class Vehicles untrue and materially misleading. Plaintiff and other Class members have been damaged as a result.

10.    Plaintiff, on behalf of herself and the Classes (defined below), seeks redress for Toyota's egregious and unconscionable misconduct, asserts claims on behalf of a National and California class for violations of: (1) California's Consumer Legal Remedies Act; (2) California's Song-Beverly Consumer Warranty Act; (3) California's

CLASS ACTION COMPLAINT

False Advertising Law; (4) California's Unfair Competition Law; (5) Negligence; and (6) a claim for violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. In addition, Plaintiff seeks an order enjoining Toyota's conduct, directing it to inform Class members of the Fuel Pump Defect and to cease driving their vehicles, directing Toyota to contact Class members and advise them that it will provide free loaner vehicles of the type of Class Vehicle each owns or leases until a remedy for the Fuel Pump Defect is installed in their Class Vehicles; compensatory damages; restitution; and punitive damages.

## II.    JURISDICTION AND VENUE

11.    Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiff and at least one Defendant are citizens of different states and satisfy the diversity requirement, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

12.    Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiff's Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

13.    This court has personal jurisdiction over Toyota because Toyota conducts substantial business in this District and some of the actions giving rise to this action took place in this District and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by Toyota anywhere were used or consumed in this state in the ordinary course of commerce, trade, or use. Toyota is one of the largest manufacturers and sellers of automotive vehicles in the world. Defendants have, at all relevant times, conducted and continue to conduct business in California, and every other state in the country.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this

- 4 -

CLASS ACTION COMPLAINT

District, Toyota has caused harm to Plaintiff and other Class members in this District, and Toyota is a resident of this District under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction in this District. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

## III.    <u>PARTIES</u>

15.    Plaintiff Tina Feng is and, at all times relevant hereto, was a resident of San Diego County and a citizen of California.

16.    Plaintiff leased a new 2019 Lexus RC 350 from Lexus San Diego in San Diego, California, on or about February 19 of 2019. Plaintiff's Lexus has a defective Denso low-pressure fuel pump and is a Recalled Vehicle.

17.    The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or bodily injury to Plaintiff, the Class, and others on the road.

18.    Plaintiff leased her Class Vehicle with the Fuel Pump Defect as part of a transaction in which Toyota did not disclose material facts related to the automobile's essential purpose – safe transportation. Plaintiff did not receive the benefit of her bargain. She leased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the value of Plaintiff's Class Vehicle. Had Toyota disclosed the Fuel Pump Defect. Plaintiff would not have leased her Vehicle, or certainly would have paid less to do so.

19.    When Plaintiff received notice of the Fuel Pump Defect she brought her vehicle to an authorized repair facility and was told that though the problem had been identified, there was no known repair and that it was unknown when a repair would be available.

20.    Additionally, Plaintiff was provided a loaner vehicle, a KIA, that is of a quality and grade substantially less than the Class Vehicle that she leased. Plaintiff was told to continue making her full lease payments and that the term of her lease would remain despite the fact that, through no fault of her own, Defendants provided a loaner vehicle of substantially lower quality than that which Plaintiff had leased but she was expected to make payments for her RC-350.

21.    Plaintiff was also told that, to avoid making a payment on the lease while her RC 350 was inoperable, she would have to make a $100.00 payment each month she wished to defer payment but doing so would extend her lease term by an additional month each deferral. Plaintiff, and members of the class, were being forced to pay for the privilege of extending a lease for a vehicle that is, and was, unsafe and unfit to operate.

22.    Defendant Toyota Motor North America, Inc. ("TMNA") is incorporated in California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024. TMNA is a holding company of sales, manufacturing, engineering, and research and development subsidiaries of TMC located in the United States.

23.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated and headquartered in the State of California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024. TMS is the United States sales and marketing division for TMC, which oversees sales and other operations across the United States. "Every [Toyota] sold in the U.S. depends upon [TMS's] extensive network of dedicated professionals who align sales and marketing resources for [Toyota's] dealers nationwide." TMS was responsible for Toyota's marketing of the Class Vehicles as safe and dependable. TMS distributes Class Vehicles and sells them through a network of dealerships that are the agents of TMS. Money received from the purchase of a Toyota made vehicle from a dealership flows from the dealer to the TMS. TMS issues the express repair warranties for the Class Vehicles.

CLASS ACTION COMPLAINT

24. Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is incorporated in Kentucky and has its primary address at 6565 Headquarters Dr., Plano, Texas 75024. TEMA is "responsible for [Toyota's] engineering design and development, R&D and manufacturing activities in the U.S., Mexico and Canada."

25. Lexus is a wholly owned brand, subsidiary, and/or division of TMC and/or TMS. TMC and TMS employ engineering, legal, compliance, and regulatory personnel to make decisions regarding the subject Lexus vehicles. These employees, on behalf of TMC and TMS, ultimately made or ratified the decisions that allowed the subject Lexus vehicles to be fraudulently designed, manufactured, marketed, and sold.

## IV. <u>FACTUAL ALLEGATIONS</u>

26. Toyota is the world's second largest manufacturer of automotive vehicles and sells its vehicles across the United States through a network of over 1,200 dealers, including those in California.

27. Toyota maintains a Lexus brand where it designs, manufacturers, markets and sells Lexus branded vehicles across the United States, including in New York.

28. Toyota has branded itself, inclusive of the Lexus brand, as the maker of safe, dependable vehicles and has spent millions, if not billions, of dollars on extensive marketing and advertising campaigns to cement the association of safety and reliability with its Toyota and Lexus brand automobiles, including Class Vehicles.

29. Toyota designs, manufactures, markets, and sells Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

### A. The Class Vehicles' Defective Low-Pressure Fuel Pump

30. The Class Vehicles are equipped with a Denso low-pressure fuel pump with a part number prefix 23220- or 23221- (the "Fuel Pump"). All Class Vehicles are equipped with the same defective Fuel Pump.

CLASS ACTION COMPLAINT

31.    At all times, by design, the Fuel Pump assembly and all of its components are exposed to gasoline within the tank.

32.    The Class Vehicles' Fuel Pump suffers from a fundamental defect causing it to prematurely fail. Based on Toyota's own admission the failure results from a defectively designed plastic impeller.

33.    The Fuel Pump assembly in the Class Vehicles was inadequately designed and/or incorporated to operate under the conditions it was intended by its designers to operate. Specifically, as Toyota admitted in the Recall Report, the "fuel pumps contain an impeller that could deform due to excessive fuel absorption.

34.    Plastics absorb liquids, typically. However, the degree of absorption varies depending on the type of plastic and its environmental conditions. When plastics absorb liquid, such as gasoline, the plastic pieces' dimensions change. Manufacturers like Toyota must adequately design and validate plastic materials exposed to liquids to ensure that they remain dimensionally stable.

35.    However, as Toyota admitted, it failed to design a plastic impeller that can remain dimensionally stable under its intended conditions. Specifically, Toyota admitted in the Recall Report that the impeller deformation "may interfere with the fuel pump body" causing it to fail and become inoperable. This pump and impeller are not designed with the necessary robustness to operate safely under normal operating conditions.

36.    The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, even death. In fact, Toyota tacitly admitted as much in the Recall Report, stating the Fuel Pump Defect can "increas[e] the risk of a crash."

37.    The Fuel Pump is an integral component of safe vehicle operation and the Class Vehicles suffer from a fundamental design flaw that causes the Fuel Pump to prematurely fail. As Toyota admitted in the Recall Report, the deformed impeller comes

CLASS ACTION COMPLAINT

in contact with the Fuel Pump body causing "illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall.

38.    Engines necessarily require steady gasoline supply for proper function. But when the Fuel Pump fails, gasoline is not supplied to the engine, causing reduced engine power, stalling, and/or engine shutdown. Compounding the problem, Fuel Pump failure occurs spontaneously with no advanced warning to the consumer.

39.    Vehicle manufacturers like Toyota monitor NHTSA and other databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects. Accordingly, Toyota knew, or should have known, of the many complaints lodged with NHTSA and elsewhere about the specific safety hazard that is the subject of the safety recall.

40.    Dating at least as far back as February 9, 2019, before Plaintiff even leased her vehicle, consumers were submitting reports to NHTSA describing issues with the Class Vehicles that arose from the defect. Consumers complained to NHTSA about uneven and unanticipated acceleration, sudden deceleration, unanticipated stalling and jerking, and other issues arising from the defective component. Such consumer complaints demonstrate the seriousness of the Fuel Pump Defect and show that Toyota knew or should have known of these reports.

41.    As an example, on February 9, 2019, the owner of a 2018 Toyota Camry filed the following complaint with NHTSA:

> I have had constant problems with my 2018 Camry since purchasing May 2018. My car is always jerking as I accelerate and when I'm driving in town, feels like I'm getting rear-ended and hesitating on highway when I have to accelerate into traffic which is very dangerous when the car won't get up and go. I have had it to the dealer several times. They reset the computer because it can save settings from previous drivers. That didn't help. They told me that it's a different transmission and it takes few seconds for the computer to communicate back to transmission. This is a very unsafe feature. ...[2]

---

[2] NHTSA Complaint ID No. 11175845.

CLASS ACTION COMPLAINT

42.     Consumers also filed additional complaints about the Fuel Pump Defect on other websites that Toyota monitored, or should have been monitoring like carcomplaints.com, a popular site that collects complaints lodged by drivers, and others.

43.     Class Vehicles suffer from a uniform design defect which causes the Fuel Pump to fail prematurely. Compounding the issue, drivers often are not protected from these safety risks by a warning prior to Fuel Pump failure.

44.     The Fuel Pump Defect causes vehicles to become dangerous to operate or inoperable while on the road and therefore they are not fit for their ordinary purpose.

**B.    Toyota Knew About the Fuel Pump Defect But Continued to Manufacture, Market, and Sell Class Vehicles**

45.     Toyota knew or should have known about the Fuel Pump Defect, but it concealed or failed to disclose the defect and continued to manufacture, market, and sell Class Vehicles. Specifically, Toyota knew or should have known the Class Vehicles needed enhanced Fuel Pumps, but it failed to provide corrective action.

46.     Toyota knew or should have known about the Fuel Pump Defect at least as soon as the prerelease process of designing, manufacturing, engineering, and testing the Class Vehicles. During these phases, Toyota would have gained comprehensive and exclusive knowledge about the Fuel Pumps, particularly the basic engineering principles behind the construction and function of the Fuel Pumps such as plastic absorption and deformation. However, Toyota failed to act on that knowledge and instead installed the defective Fuel Pumps in the Class Vehicles, and subsequently marketed and sold the vehicles to unsuspecting consumers without disclosing the safety risk or warning Class members.

47.     Moreover, Toyota knew about the Fuel Pump Defect based on the large number of claims for Fuel Pump Defect repair and replacement that it admits to receiving. Specifically, Toyota has identified at least 2,571 warranty claims associated with the Fuel Pump Defect.

CLASS ACTION COMPLAINT

48.    Further, federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential defects.[3] Accordingly, Toyota should (and does) monitor NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Fuel Pump Defect.

49.    From its monitoring of the NHTSA databases, Toyota knew or should have known of the many Fuel Pump Defect complaints lodged. However, Toyota failed to act on that knowledge, failed to warn Class members of the danger, and failed to identify and provide a repair for the Fuel Pump Defect.

50.    Finally, Toyota knew about the Fuel Pump Defect through its own investigation. Toyota conducted numerous field investigations that it later used to generate Field Technical Reports. However, Toyota failed to act on that knowledge by warning Class members or by identifying a repair or replacement part.

51.    Despite Toyota's extensive knowledge, Toyota failed to act on that knowledge by warning Class members. Sacrificing consumer safety for profits, Toyota instead chose to enrich itself by using false and misleading marketing to sell the Class Vehicles as safe and durable at inflated prices.

### C.    Toyota Touted the Class Vehicles as Safe and Dependable, Concealing the Fuel Pump Defect from Consumers

52.    Toyota's overarching marketing message for the Class Vehicles was that the vehicles are safe and dependable and that their engines can be relied on to perform well. This marketing message is false and misleading given the propensity of the Fuel Pump Defect in the Class Vehicles to fail, causing the vehicles' engines to run rough, stall and become inoperable, which Toyota admits increases the risk of a crash.

53.    Toyota is one of the ten biggest advertising spenders in the United States and much of that advertising budget goes toward promoting its brands as safe and

---

[3] *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000)

CLASS ACTION COMPLAINT

dependable. Toyota's main website touts the safety features of its vehicles, attempting to induce potential customers to purchase or lease the Class Vehicles.

54.    On Toyota's consumer facing website, there is a page describing the Company's leadership that repeats its consistent and pervasive marketing message that Toyota vehicles are safe and dependable. Toyota states: "We build cars and trucks that help you and your family go places reliably and safely."

55.    Toyota's website currently contains and has contained these representations at all relevant times during the Class Period.

56.    Similar representations are found on the Lexus website, operated by Defendants. Lexus.com has a detailed section with many subheadings and tabs devoted to describing a host of safety features on Lexus vehicles. The overall consistent and pervasive marketing message that Toyota promotes to consumers via web marketing for its Lexus Class Vehicles is clearly one of safety and dependability.



57.    This section of the website describes additional safety features ranging from airbags to GPS-based emergency assistance, which also appeared on the website

in 2018. As shown above, at the time Plaintiff leased her vehicle, and earlier, Lexus boldly declares, "ONE STEP CLOSER TO A WORLD WITHOUT ACCIDENTS. LEXUS SAFETY.... At Lexus, we're constantly looking out for the driver. It's why nearly every new Lexus model comes standard with Lexus Safety System+, a comprehensive suite of active safety equipment."

58.    In addition to its representations about Toyota and Lexus vehicles generally, Toyota's website contains specific representations about safety on the pages for specific models of the Class Vehicles.

59.    For example, webpages of various models of the Class Vehicles include multiple photographs and descriptions advertising the safety systems of each of the 2020 and 2019 Toyota models as well as the 2020 and, in many cases, 2019 Lexus models. On information and belief, similar representations were made about the 2018 models of the Class Vehicles when they were being marketed on the Toyota and Lexus websites. Those sections list an array of safety features such as airbags, side impact protection, and other safety measures.

60.    The individual web pages for the Toyota models that are part of the Recall proudly proclaim that the vehicles come standard with the "Star Safety System."

61.    The Lexus website makes similar representations about the safety of the individual Lexus models that are part of the Recall. For example, multiple Class Vehicles' individual pages contain the following statement: "LEXUS SAFETY SYSTEM+* ... With an integrated suite of active safety equipment, security comes standard," and go on to list an array of safety features, from airbags to computerized functions.

62.    A car with a defective fuel pump that can cause the engine to stutter or stall while the vehicle is in motion, as do the Class Vehicles, and thereby exposes its occupants to the risk of injury and even death *is not a safe car*. Thus, Toyota's marketing of the Class Vehicles as safe is false and misleading and omits facts that

would be material to consumers such as Class members who purchased or leased Class Vehicles because they were consistently marketed as having the utmost safety on the road.

63.    In addition to its representations about safety, Toyota also made false and misleading representations about the durability, power and functioning of the engines of the Class Vehicles. For example, in its marketing for the 2019 Toyota 4Runner, the Toyota webpage touts its "durability," that the 4Runner is "[f]itted to survive," and tells drivers: "You won't fall short of power."

64.    Similarly, with respect to the 2018 Lexus RX, the Lexus website touts the vehicle's "exceptionally smooth performance":

65.    As with Toyota's representations about the safety of the Class Vehicles, these and similar representations about their performance are false and misleading. Toyota's representations that "you won't fall short of power," and that the Lexus has an "exceptionally smooth performance," are false and misleading because, as Toyota admits through the Recall, the Class Vehicles are unsafe and do not perform as advertised because they are prone to Fuel Pump failure that can lead to rough running, engine hesitation and stalling while the vehicle is in motion, and render the Class Vehicles inoperable while on the road.

66.    Similar representations to those that Toyota made on the Toyota and Lexus websites were also included in brochures for the Class Vehicles and throughout Toyota's other messaging about the Class Vehicles.

67.    Toyota marketed the Class Vehicles as safe and dependable but failed to disclose the existence and impact of the Fuel Pump Defect and/or that the Class Vehicles were not safe or dependable. Specifically, Toyota:

        a.    Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Fuel Pump Defect, despite its knowledge of the performance issues;

- 14 -

b.    Failed to disclose, at and after the time of purchase, lease, and/or service, the Class Vehicles' Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

c.    Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

68.    Toyota's deceptive marketing and willful and knowing failure to disclose the Fuel Pump Defect damaged, and continues to damage, Plaintiff and Class members. If Plaintiff and Class members had known of the Fuel Pump Defect and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would have paid less to do so.

**D.    Toyota Issued an Inadequate Recall**

69.    On January 13, 2020, Toyota instituted a voluntary safety recall of the Recalled Vehicles admitting that the defective Fuel Pump prematurely fails, compromising consumer safety.

70.    In connection with the Recall, Toyota identified as the root cause a plastic impeller which deforms due to fuel absorption.

71.    Toyota stated that it was aware of at least 66 Toyota Field Technical Reports and 2,571 warranty claims associated with the Fuel Pump Defect. By instituting the Recall, Toyota admitted the Fuel Pump Defect is a serious safety defect that could lead to a crash, which can result in serious injury or death.

72.    Toyota, however, limited the Recall to a subset of model year 2018-2019 Class Vehicles. Specifically, Toyota limited the Recall to the Recalled Vehicles, which are non-hybrid Toyota and Lexus Class Vehicles manufactured between August 1, 2018 through January 31, 2019 and equipped with a Denso made low-pressure fuel pump. The Recall omits other Class Vehicles equipped with the same defective Fuel Pumps.

73.     Although Model Year 2018-2019 Hybrid variant Class Vehicles are not included in the Recall, as Toyota admits in the Recall Report, they too are equipped with the same defective Fuel Pump. These Hybrid variant Class Vehicles also experience the Fuel Pump Defect.

74.     Omission of these Hybrid variants from the Recall is improper, as Toyota had ample knowledge the defect exists within these vehicles.

75.     Egregiously, Toyota, despite issuing the Recall, has not notified the owners of the Recalled Vehicles let alone the Class Vehicles of the Fuel Pump Defect. Toyota acknowledged the defect and the serious safety consequences the defect presents on January 13, 2020 by submitting the Recall Report to NHTSA. Thus, while Toyota knew the Fuel Pump Defect could result in collision and serious injury, Toyota's business strategy was to remain silent and keep consumers in the dark about the dangerous defect until sometime after it identified the issue internally and acknowledged the defect to NHTSA.

76.     Further, as Toyota states in the Recall Report, there is no corrective repair for the Fuel Pump Defect and it "is still under study." This means there is no guarantee that there will be a corrective repair and that affected owners and leases have no idea when or if they will be able to use their vehicles again. Moreover, Toyota has provided no date by which its "study" of a potential repair will be completed let alone when the fix can be implemented.

77.     Therefore, the Recall is inadequate and unconscionable. It fails to promptly alert Class members to the admittedly dangerous Fuel Pump Defect and provide them with a safe alternative, which will inevitably lead to more Fuel Pump failures, and possibly injury or death. The Recall is also inadequate in scope, omitting hybrid versions of the Recalled Vehicles equipped with the same Fuel Pump. These actions are deceitful, unconscionable, and expose Class members to injury and death. In addition

to these dangers, Toyota's actions have deprived purchasers and lessees of the Class Vehicles of the benefit of their bargain.

### E. Applicable Warranties

78. Toyota sold and leased the Class Vehicles with express written warranties.

79. For the Toyota branded Class Vehicles, Toyota offered a written express basic warranty covering Toyota brand vehicles for 36 months or 36,000 miles covering all components (except normal wear and tear). Toyota also offered a 60 month or 60,000 miles powertrain warranty.

80. For the Lexus branded Class Vehicles, Toyota offered a written express Limited Warranty of four years or 50,000 miles. Toyota also offered a six-year 70,000 miles powertrain warranty.

81. Toyota provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

82. However, Toyota admitted a breach of these warrantied in the Recall Report when it reported it did not have a repair. Class members complain to dealers about the Fuel Pump.

### V. CLASS ACTION ALLEGATIONS

83. Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

84. Plaintiff seeks to represent a California statewide class ("California Class") defined as follows:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of California.

85.    Plaintiff also seeks to represent a class ("National Class") defined as:

All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the United States.

86.    Excluded from the California and National Classes ("Classes") are Toyota and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend definitions of the Classes, and to add additional classes and sub-classes, as appropriate, during the course of this litigation.

87.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

88.    **Numerosity** – **Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believes that there are not less than at least approximately 700,000 members of the Classes, the precise number of Class members is unknown to Plaintiff but may be ascertained from Toyota's books and records. National and California Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

89.    **Commonality and Predominance** – **Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a.    whether Toyota's alleged conduct violates applicable law;

b. whether Toyota designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c. whether Toyota made false or misleading statements about the quality and safety of the Class Vehicles;

d. whether the Class Vehicles contain the Fuel Pump Defect;

e. whether Toyota had actual or implied knowledge about the alleged defect but failed to disclose it to Plaintiff and the other members of the Classes;

f. whether Toyota's omissions and concealment regarding the quality of the Class Vehicles were likely to deceive the Statewide Class members in violation of the state consumer protection statutes alleged herein;

g. whether Toyota breached its express warranties with respect to the Class Vehicles;

h. whether Toyota breached its implied warranties with respect to the Class Vehicles;

i. whether Toyota breached its implied warranties with respect to the Class Vehicles;

j. whether the members of the Classes overpaid for their Class Vehicles as a result of the defect alleged herein;

k. whether the members of the Classes are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

l.    the amount and nature of relief to be awarded to Plaintiff and the other members of the Classes.

90.    **Typicality** – **Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because Plaintiff and the members of the Classes purchased or leased Class Vehicles that contain defective Fuel Pumps, as described herein. Neither Plaintiff nor the other members of the Classes would have purchased the Class Vehicles, or would have as much as they did for the Class Vehicles, had they known of the Fuel Pump Defect. Plaintiff and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which Toyota engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

91.    **Adequacy of Representation** – **Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Classes that she seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

92.    **Declaratory and Injunctive Relief** – **Federal Rule of Civil Procedure 23(b)(2).** Toyota has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the National and California Class members as a whole.

93.    **Superiority** – **Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management

- 20 -

of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Toyota, so it would be impracticable for the other members of the Classes to individually seek redress for Toyota's wrongful conduct. Even if these Class members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device, as intended by Congress, presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS FOR RELIEF

### COUNT 1
### VIOLATION OF CONSUMER LEGAL REMEDIES ACT,
### Cal. Civ. Code §§ 1750, et. seq.
### (Individually and on Behalf of the California Class)

94.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

95.   Plaintiff brings this cause of action on behalf of herself and on behalf of the California Class.

96.   Defendants are "persons" as defined by California Civil Code § 1761(c).

97.   Plaintiff and the California Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased the Class Products for personal, family, or household use.

98.   The sale of the Class Products to Plaintiff and the putative Class members is a "transaction" as defined by California Civil Code § 1761(e).

99.   Defendants' acts and practices, which were intended to result, and which did result, in the sale of the Class Products, violate § 1770 of the Consumer Legal Remedies Act for at least the following reasons:

    a.  Defendants represented that the Class Vehicles have characteristics, uses or benefits which they do not have;

    b.  Defendants advertised their goods with intent to not sell them as advertised;

    c.  Defendants represented that their products are of a particular standard, quality, or grade when they are not; and

    d.  Defendants represented that their goods have been supplied in accordance with a previous representation when they have not.

100.  By failing to disclose and concealing the defective nature of the Class Vehicles from Plaintiff and the prospective class members, Defendant violated California Civil Code § 1761(a), as it represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles and their engine components were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

101.  Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

102.  Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use. This Defect was found in each of the Class Vehicles at purchase or lease but may have not been discovered by putative class members until months, or years, after the purchase. Indeed, Defendants knew, or should have known, well in advance of the recall notice that the Class Vehicles contained a defect that presents a substantial danger of bodily injury or death.

103. As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and /or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

Additionally, as a result of the defect, Plaintiff and the class members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

104.    Defendants were under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles and/or associated repair costs because Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicle and Plaintiff and the class members could not reasonably have been expected to learn or discover that their trucks had a dangerous safety defect until it manifested.

105.    In failing to disclose the defective nature of the Class Vehicles prior to January 2020, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

106.    A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and the Class Members to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them and were material. Had Plaintiff and the class members known of the defective nature of the Class Vehicles, they would not have purchased or leased the vehicles or would have paid less for them.

107.    Plaintiff and the Class Members are reasonable consumers who do not expect their vehicles to suddenly accelerate, decelerate, or stall without warning and while underway.  This is the reasonable and objective consumer expectation relating to consumer automobiles.

108.    As a result of Defendants' conduct, Plaintiff and the Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience a failure for the truck to engage while in reverse.

109.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the Class Members suffered and will continue to suffer actual

damages. Had Defendants disclosed the true nature and/or danger in its vehicles, Plaintiff and members of the Class would not have been misled into purchasing Defendants' vehicles or would have paid significantly less for them.

110.    Plaintiff, on behalf of herself and all other similarly situated California consumers, and as appropriate, on behalf of the general public of the State of California, seeks injunctive relief prohibiting Defendants from continuing these unlawful practices pursuant to California Civil Code § 1782(a)(2), and such other equitable relief, including restitution of either (1) the full purchase or lease price paid by customers who purchased a Class Vehicle, or (2) a portion of the purchase or lease price paid by customers who purchased or leased a Class Vehicle reflecting the difference in value as compared to a vehicle without the defect.

111.    Plaintiff provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) *via* certified mail, attached hereto as Exhibit A, demanding that Defendants correct such violations. If Defendants fail to respond to the letter within 30 days Plaintiff will amend her complaint to seek damages and attorneys' fees as allowed by the CLRA

**COUNT II**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT**
**Cal. Civ. Code § 1790, *et seq*.**
**(Individually and on Behalf of the California Class)**

112.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

113.    Plaintiff brings this cause of action on behalf of herself and on behalf of the California Class as a result of Defendants' breach of its express and implied warranties.

114.    Plaintiff is a buyer, as Civil Code section 1791, subdivision (b), defines the term "buyer."

115.    The Class Vehicles are consumer goods, as Civil Code section 1791, subdivision (a), defines the term "consumer good." The Class Vehicles are new motor

- 24 -

vehicles, as Civil Code section 1793.22, subdivision (e)(2) defines the term "new motor vehicle."

116.    Defendants were, at all times relevant hereto, the manufacturer, distributor, warrantor, lessor, and/or seller of the Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

117.    Plaintiff leased a Class Vehicle from Defendants and Defendants provided Plaintiff and the Class Members with a standard express written warranty covering the Class Vehicles which states, in part, that:

> "The Basic Warranty coverage is for 48 months or 50,000 miles, whichever occurs first. Wheel alignment and balancing are covered for 12 months or 12,000 miles, whichever occurs first.
>
> This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Lexus…"

The Lexus "Power Train Warranty" further states that, "The Powertrain Warranty is for 72 months or 70,000 miles, whichever occurs first." And expressly includes engine parts in the Powertrain Warranty inclusive of "[c]ylinder block and head and all internal parts, timing belt and cover, flywheel, oil pan, water pump, fuel pump, engine mounts, engine control computer, seals and gaskets."

118.    Plaintiff was informed by Defendants within one year of her lease that a recall had been issued because the fuel pump, an engine part expressly warranted by Defendant, was defective. Upon being informed of the defective part, Plaintiff took her vehicle to Defendants' authorized repair facility but was informed that, as of the date of the repair request, no repair was available and the date that a repair would be available was unknown.

119.    Defendants were unable to conform the Class Vehicles to the express warranty, drafted and issued by Defendants, and rather than repair Plaintiff's leased vehicle, Defendants replaced the vehicle with one of inferior quality while insisting that

Plaintiff continue to make full lease payments on a Vehicle she could not operate and one that could not be made to conform to Defendant's express warranty.

120.   Plaintiff and the Class Members were harmed because they leased or purchased a vehicle and paid the full purchase or lease price of those vehicles but were unable to use the vehicles due to the defect. Temporary loaner vehicles that were provided to Plaintiff and Class Members were not of the same quality as the vehicles that they purchased or leased and Plaintiff and the Class Members suffered substantial economic injury and other harm as they were deprived of the benefit of the bargain that they struck with Defendants.

121.   Defendants failure to equip the vehicles with an appropriate and reliable fuel pump, and failure to repair the defective fuel pump such that the vehicle conformed with the express warranty was a substantial factor in Plaintiff's, and the Class Members', harm.

122.   Defendants are unable to conform the vehicle to the express warranties despite being afforded a reasonable opportunity to do so by Plaintiff. And Defendants will neither replace the Class Vehicles nor refund the purchase price. Rather Defendants insist that Plaintiff, and members of the class, continue making payments on inoperable vehicles.

123.   Since being informed of the defect in the Class Vehicles, neither Plaintiff nor Class Members have been able to drive their vehicles as the defect in the fuel pump is likely to cause death or serious injury if it fails while the Class Vehicles are being operated.

124.   Under the Song-Beverly Consumer Warranty Act, all express warranties are accompanied by the implied warranty of merchantability, which may not be disclaimed by the manufacturer or retail seller.

125.   Defendants were, at all times relevant hereto, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

126.  Defendants provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they are sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

127.  Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (1) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (2) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

128.  Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective.

129.  Defendants' breach of express and implied warranties was willful and has deprived Plaintiff and the Class Members of the benefit of their bargain.

130.  Defendants' have had multiple reasonable opportunities to cure its breach, but either can not or will not do so due to conditions reasonably with their control. Per the Song-Beverly Consumer Warranty Act, if the manufacturer is unable to conform a New Motor Vehicle to the express warranty, then the manufacturer shall promptly replace the vehicle with one that conforms to the express warranty or reimburse the buyer. Defendants have done neither despite being informed that the Class Vehicles are defective and do not conform with applicable warranties.

CLASS ACTION COMPLAINT

131.    Defendants' breach of express and implied warranties was willful and has deprived Plaintiff and the Class Members of the benefit of their bargain.

132.    As a direct and proximate cause of Defendants' breach of express and implied warranties, Plaintiff and the Class Members sustained damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiff and the Class Members, who are entitled to recover under section 1794 of the act, including civil penalties, actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other such relief the Court deems appropriate.

## COUNT III
## VIOLATION OF FALSE ADVERTISING LAW
### Cal. Bus. & Pro. Code § 17500, *et seq*.
### (Individually and on Behalf of the California Class)

133.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

134.    Plaintiff brings this cause of action on behalf of herself and on behalf of the California Class.

135.    Toyota has benefitted from intentionally selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Toyota's concealment of the Fuel Pump Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

136.    Defendants publicly disseminated advertising and promotional material that was designed and intended to convey to the public that the Class Vehicles were safe, reliable, and operated as consumers would expect the Class Vehicles to operate.

137.    Defendants were aware, or should have been aware, of the Fuel Pump Defect at the time Plaintiff and members of the Class purchased or leased the Class Vehicles.

138.    Defendants negligently, or intentionally, made representations in their advertisements but, due to issues they were aware of, did not sell vehicles that conformed with the representations and promises in their publicly disseminated advertisements.

139.    Toyota has unjustly received and retained benefits from Plaintiff and the other members of the Class, which contrary to equity and good conscience.

140.    It is inequitable and unconscionable for Toyota to retain these benefits.

141.    Because Toyota wrongfully concealed its misconduct, Plaintiff and the other members of the Class were not aware of the facts concerning the Class Vehicles and did not benefit from Toyota's misconduct.

142.    Toyota knowingly accepted the unjust benefits of its wrongful conduct.

143.    As a result of Toyota's misconduct, Plaintiff and the other members of the Class suffered an injury-in-fact and lost money and/or property in an amount to be proven at trial.

## COUNT IV
## VIOLATION OF UNFAIR COMPETITION LAW
### Cal. Civ. Code § 17200, *et seq.*
### (Individually and on Behalf of the National and California Classes)

144.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

145.    Plaintiff brings this cause of action on behalf of herself and on behalf of the California and National Classes.

146.    As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the defect, Plaintiff and the Class Members were harmed

- 29 -

and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

147.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

148.   Plaintiff and the members of the class are reasonable consumers who do not expect their vehicles to suffer from sudden acceleration, deceleration, and stalling without warning.

149.   Defendants' knew the Class Vehicles suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

150.   In failing to disclose the Defect, Defendants' have knowingly or intentionally concealed material facts and breached their duty not to do so.

151.   Defendants were under a duty to Plaintiff and the Class Members to disclose the defective nature of the trucks and/or associated repair costs because Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles and Plaintiff and the class members could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until it manifested.

152.   A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and the Class Members to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them and that such facts were material. Had Plaintiff and the class members known of the defective nature of the Class Vehicles, they would not have purchased or leased the vehicles or would have paid less for them.

153.   Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report problems.  Indeed, Defendants continues to cover up and conceal the true nature of the problem.

154.   Defendants' acts, conduct, and practices were fraudulent, in that they constituted business practices and acts that were likely to deceive reasonable members of the public. Defendants acts, conduct, and practices were fraudulent because they are immoral, unethical, oppressive, unscrupulous, and/or are substantially injurious to consumers.

155.   Defendants' acts, conduct, and practices were unfair, in that they constituted business practices and acts the utility of which does not outweigh the harm to consumers. Defendants' business acts and practices were further unfair in that they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

156.   A business practice is unlawful if it is forbidden by any law. Defendant's acts, conduct, and practices were unlawful, in that they constituted:

a.   Violations of the California Consumer Legal Remedies Act;

b.   Violations of the Song-Beverly Consumer Warranty Act;

c.   Violations of the False Advertising Law;

d.   Violations of Magnuson-Moss Consumer Warranty Act; and

e.   Violations of the express and implied warranty provisions of California Commercial Code sections 2313 and 2314.

157.   By its conduct, Defendant' have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

158.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

159.   As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and the Class have suffered and will continue to suffer actual damages.

160.   Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and the Class pursuant to §§ 17203 and 17204 of the Business & Professions Code. Plaintiff and members of the class also seek further injunctive relief as deemed appropriate by the court.

**COUNT V**
**NEGLIGENCE**

**(Individually and on Behalf of the National and California Classes)**

161.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

162.   Plaintiff brings this Count individually and on behalf of the members of the National and California Classes

163.   Defendants' owed a duty to Plaintiff and members of the classes to provide a vehicle that conformed with its publicly disseminated representations, its warranties, and promotional information given to Plaintiff and members of the Classes at the time of the respective transactions.

164.   Defendants harmed Plaintiff and members of the classes by negligently designing, testing, engineering, and incorporating the defective fuel pump into the Class Vehicles.

165.   Defendants' negligence was a substantial and necessary factor in causing Plaintiff and members of the classes harm and it was foreseeable by Defendants that Plaintiff and members of the classes would be harmed by negligently designing, testing, engineering, and incorporating the defective fuel pump into the Class Vehicles.

166.   As a result of Defendants' negligence, Plaintiff and members of the classes are entitled to recover damages in an amount to be proven at trial, and such other relief as the court may deem appropriate.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VI
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, et seq.
### (Individually and on Behalf of the National Class)

167.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

168.   Plaintiff brings this Count individually and on behalf of the other members of the National Class (the "Class," for purposes of this Count).

169.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

170.   Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

171.   Defendants are a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

172.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

173.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

174.   In its express written warranties, Defendants expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

175.   Defendants' warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

176.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of Defendants' written warranties and implied warranty became part of the basis of the bargain between Toyota and Plaintiff and other Class members

CLASS ACTION COMPLAINT

177. Defendants breached the implied warranty of merchantability. Without limitation, the Class Vehicles have Fuel Pumps that prematurely fail, as described above, which renders the Class Vehicles unmerchantable.

178. Defendants breached its express warranties by not offering a functioning repair for the defective Fuel Pump in the Class Vehicles as evidenced by Toyota's own admission in the Recall Report that it has not identified a remedy.

179. Further, Defendants have refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. Class members reported the Fuel Pump failure to their dealer, but Toyota has failed to repair the defect.

180. At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Fuel Pump Defect.

181. The amount in controversy of Plaintiff's individual claim exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

182. Plaintiff, individually and on behalf of the Class members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for relief and judgment as follows:

A.    For an order declaring that this action is properly maintained as a class action and appointing Plaintiffs as representatives for the Class, and appointing Plaintiffs' counsel as Class counsel;

B.    That Defendants bear the costs of any notice sent to the Classes;

CLASS ACTION COMPLAINT

C.     For an order awarding Plaintiffs and the members of the Classes actual damages, restitution and/or disgorgement;

D.     For an order enjoining Defendants from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

E.     For an order awarding Plaintiffs and the members of the Classes pre- and post-judgment interest;

F.     For an order awarding attorneys' fees and costs of suit, including expert's witness fees as permitted by law; and

G.     Such other and further relief as this Court may deem just and proper.

## VIII. **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury for all of the claims asserted in this Complaint so triable.

DATED: March 20, 2020                        Respectfully submitted,

FINKELSTEIN & KRINSK LLP

By:  /s/ John J. Nelson

Jeffrey R. Krinsk, Esq.
John J. Nelson, Esq.
501 West Broadway, Suite 1260
San Diego, CA 92101
Telephone:  (619) 238-1333
Facsimile:   (619) 238-5425

Attorneys for Plaintiffs
and the Putative Classes

CLASS ACTION COMPLAINT